Lance Lundvall
LUNDVALL LAW OFFICE
301 North 27th Street, Suite 310
Billings, MT 59101
Telephone/Facsimile: (406) 294-0515
Email: lance@lundvalllaw.com

Attorney for Defendant

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 20-24-BLG-DLC |
| Plaintiff, | **DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO SUPPRESS** |
| v. | |
| NICHOLAS JAMES IMHOFF, | |
| Defendant. | |

## I.    INTRODUCTION

Imhoff is charged with Count I: Conspiracy to Possess with Intent to Distribute Methamphetamine and Count II: Possession with Intent to Distribute Methamphetamine. Montana Highway Patrol Trooper Fetterhoff (hereinafter Fetterhoff) unconstitutionally extended the traffic stop in order to pursue a hunch that Imhoff was trafficking drugs. Nothing that occurred during the course of the traffic stop justified Fetterhoff extending the stop beyond the time required to issue

1

Imhoff a citation or warning for a speeding violation. Fetterhoff lacked reasonable suspicion to believe that Imhoff was involved in criminal activity. The Court should suppress all evidence obtained from the search of the vehicle.

## II.    FACTS

The following facts were taken from the discovery provided to Imhoff by the government pursuant to this Court's scheduling order, focusing on Fetterhoff's Incident Report (USAO – 003-007) and the MHP Dash Cam video.

### A. Traffic Stop

On February 11, 2020, at approximately 10:26 a.m., Fetterhoff observed a vehicle he believed to be speeding above the posted speed limit of 80 mph near Reed Point. (USAO – 004.) Fetterhoff tracked the vehicle and radared its speed to be 86 miles per hour. *Id.*

Fetterhoff initiated a traffic stop of the vehicle, a 2019 Dodge Grand Caravan, at mile marker 400 between Reed Point and Columbus. *Id.* He approached the van, bearing an Illinois license plate, from the passenger side. *Id.* He stated in his report that he recognized the vehicle was a rental. *Id.*  Fetterhoff identified Nicholas Imhoff as the driver and sole occupant of the vehicle by his Florida driver's license. *Id.* Imhoff provided Fetterhoff with a five-day rental contract for the vehicle originating from Las Vegas. *Id.*

2

Fetterhoff reported that Imhoff stated that he was "going back to work in North Dakota, working in the oilfield." *Id.* Fetterhoff claimed that based on his experience with previous traffic stops of oilfield workers and his knowledge of the oilfield that "a five day rental is not consistent with normal shift operation in the oilfield." *Id.*

Fetterhoff claimed that from his position outside the vehicle, he "noted no visible luggage in the rear seats, one small travel bag in the front passenger seat, an energy drink can on the floor, food wrappers on the floor, to-go food in the front seat area, a carton of cigarettes on the seat, and bottles of water on the floor." (USAO – 004-005.) Frankly, putting a suitcase or overnight bag in a back seat in a minivan would seem odd. The suitcase belongs in a trunk of a car or the very back hatch area in a minivan. Ironically, Fetterhoff's video shows the trooper and Imhoff stop at the back of the minivan where Imhoff points out his travel bag is in fact in the back, where it is commonly found. Fetterhoff then stated that his observations were "consistent with hard, quick travel" which he immediately correlated to "someone who is making quick trips from point to point, engaged in the transportation of drugs." (USAO – 005.)

Fetterhoff reported that he asked Imhoff if he had any oilfield clothing or items. *Id.* Imhoff stated that all his clothing and items were in his house in North Dakota. *Id.*

Fetterhoff noted that at that time, "All things seen thus far in the traffic stop were indicators to me, based on my training and experience, of possible drug trafficking." *Id.* Fetterhoff claimed in his report that, based on his training and experience, Las Vegas was known to "be a source area for drugs." *Id.* He also stated that "North Dakota and the oilfield are known destination areas for the drop off point for many drugs coming east along Interstate 90." *Id.* He stated that at that point in the stop, "I believed Imhoff to be transporting drugs within his rental vehicle." *Id.*

Fetterhoff asked Imhoff to exit his vehicle and join the Trooper in his patrol car. purportedly for a speeding violation, as is his "common practice." *Id.*

According to the approximate timestamps from the dash cam video provided in discovery, after pulling Imhoff over, Fetterhoff exited his patrol vehicle at timestamp 5:52 and approached Imhoff's passenger side. (MHP Dash Cam video.) He asked Imhoff, "How are you?"[1] at timestamp 6:05. *Id.* At timestamp 7:17, Fetterhoff asked Imhoff to come back to his patrol car. Imhoff exited his vehicle and began to walk toward Fetterhoff's patrol car. *Id.* The entire discussion between Fetterhoff and Imhoff described above occurred in an incredibly short time span of one minute and twelve seconds.

---

[1] This is one of the few discernable pieces of conversation from the video provided in discovery. The rest of the conversation is largely obscured by an electromagnetic buzzing sound.

### B. Inside Fetterhoff's Patrol Car

Upon Imhoff entering Fetterhoff's vehicle, Fetterhoff alleges that he noted Imhoff "to be visibly shaking." (USAO – 005.)  Fetterhoff wrote that "Imhoff's level of over nervousness was not consistent with the innocent motoring public." *Id.* Despite the fact the Montana Highway patrol vehicles are equipped with rear-facing cameras to see the inside of the car to both visually and audibly observe the occupants, ironically, that camera footage does not exist in this particular trooper's car. The undersigned was advised that the camera was disconnected due to "interference with other in-car electronics." Thus, no in-car video exists to confirm Fetterhoff's allegations. However, Imhoff did not appear overly nervous while walking from his vehicle to the trooper's patrol car, as seen at timestamp 7:17 in the dash cam video.

Fetterhoff called in the traffic stop to MHP dispatch and began writing out a warning card for the speeding violation. *Id.* The Trooper asked Imhoff what he did in the oilfield and Imhoff replied that he hauled water. *Id.* Imhoff stated he had car troubles in Las Vegas and had to stay there for two days with a friend. *Id.* He then stated he rented the minivan to drive to North Dakota. *Id.*  Fetterhoff again noted his belief that Imhoff's statements were not consistent with his understanding of "common work schedules in North Dakota." *Id.*

5

Fetterhoff further alleged that Imhoff's level of nervousness "never subsided, only grew to the point where I could see his heart and stomach pulsating through his shirt, which is not consistent with the innocent motoring public." *Id.* Again, we are unable to confirm this statement without the benefit of the trooper's conveniently disconnected in-car camera.

Fetterhoff asked MHP dispatch to run a criminal history check on Imhoff "specifically looking for drug related offenses." *Id.* He told Imhoff that he would run his driver's license and vehicle registration, give him a warning, and then he would be free to leave. *Id.* Dispatch, over the radio, informed Fetterhoff that Imhoff had no criminal history, whatsoever, including no drug offenses. He does not have so much as a traffic citation in the criminal history provided in discovery. *Id.*

As Fetterhoff finished up writing the warning, he asked Imhoff about his North Dakota address. *Id.* Trooper Fetterhoff claimed that Imhoff "changed his story and stated he didn't have a house, he only rented a room from his friend." *Id.* To ce clear, Imhoff never stated he *owned* a house in North Dakota. He simply stated he "had" a house.  The trooper claimed Imhoff was unable to provide his specific address to Fetterhoff, nor was he able to provide the zip code where he lived in North Dakota. *Id.* Imhoff provided his phone number when asked. *Id.*  Fetterhoff then finished filling out the warning card. *Id.*

After Fetterhoff returned Imhoff's documents to him, essentially ending the traffic stop, Fetterhoff stated in his report, "I believed he was lying to me about all things related to North Dakota and his residence." *Id.* Fetterhoff again described in his report that he "believed Imhoff was engaged in *major* criminal drug activity." *Id.* (emphasis added).

After Fetterhoff issued Imhoff the speeding warning, he told Imhoff they were done with the initial traffic stop, Imhoff was free to leave, and he was not under arrest, but he could not drive his vehicle away "until we figured out exactly what was going on." *Id.* Fetterhoff "told Imhoff that I didn't think that his trip was legitimate." (USAO – 006.) At some point, although the exact point is unclear, Fetterhoff read Imhoff his *Miranda* rights. (USAO – 005).

Imhoff denied that drugs were present in the vehicle and denied Fetterhoff consent to search the vehicle. (USAO – 006.)  Fetterhoff advised Imhoff that he would deploy his K9 on the vehicle because he believed Imhoff was transporting controlled substances. *Id.* Fetterhoff advised Imhoff that he was free to leave and offered him a ride to town. *Id.*

According to the approximate timestamps from the dashcam video, Imhoff entered Fetterhoff's car at time stamp 7:40. (MHP Dash Cam video.) At timestamp 21:52, approximately 14 minutes later, Fetterhoff exited the vehicle. *Id.*

Before Fetterhoff deployed his K9, MHP Trooper Metcalfe (Metcalfe) arrived to assist. Imhoff was escorted to Metcalfe's vehicle and he sat with Metcalfe while the K9 conducted the drug sniff. Interestingly, the rear-facing video camera in Metcalfe's vehicle was actually connected, and both Metcalfe and Imhoff can be seen and heard during the K9 search.  Imhoff's demeanor in the Metcalfe video is substantially different than Fetterhoff's description that Imhoff's nervousness rose to a level he could see his heart pounding. Imhoff's demeanor was actually quite the opposite while a K9 sniffed his vehicle.

At timestamp 24:25 Fetterhoff deployed the K9. *Id.* Trooper Fetterhoff returned the K9 to his vehicle at approximately timestamp 26:50, about two and one half minutes after deploying the dog. *Id.*

### C. K9, Search Warrant, and Vehicle Search

Fetterhoff seized Imhoff's vehicle after the K9 alerted to the presence of controlled substances in the vehicle. (USAO – 006).  Fetterhoff secured and sealed the vehicle. (USAO – 006).  A tow truck towed the vehicle to Columbus. (USAO – 006).  Metcalfe then transported Imhoff to Columbus at Imhoff's request.

Fetterhoff applied for and was granted a Montana State Search Warrant for the 2019 Dodge Grand Caravan. (USAO – 006).  Members of the MHP searched the vehicle and seized approximately 78 pounds of methamphetamine from the vehicle. (USAO – 006).   Sergeant Cody Smith, who assisted Fetterhoff with the vehicle

search, arrested Imhoff at the Columbus Town Pump gas station. (USAO – 006). Imhoff was transported to Billings DEA office where DEA took him into custody and took over the investigation. (USAO – 006).

## III.   ARGUMENT

The Fourth Amendment to the United States Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. Amend. IV. A traffic stop is a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Therefore, the traffic stop must be reasonable. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). The reasonableness of police conduct during a traffic stop is measured by examining "the totality of the circumstances." *Robinette*, 519 U.S. at 39. A traffic stop may be extended where evidence unfolds to support a suspicion of criminal activity. *United States v. Rodgers*, 656 F.3d 1023, 1027 (9th Cir. 2011).

"A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In determining whether a traffic stop is illegally extended, a district court considers "whether the police diligently pursued a means of investigation that was likely to

confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

"[M]ere police questioning does not constitute a seizure" unless the questioning prolongs the detention of that person. *Muehler v. Mena*, 544 U.S. 93, 101 (2005). Reasonable suspicion is not required to justify questioning that does not prolong the stop. *Muehler*, 544 U.S. at 101. For example, asking for a driver's consent to search a box in the vehicle that "look[ed] very odd" did not prolong the stop where the officer recognized the driver as a previously arrested drug dealer. *United States v. Turvin*, 517 F.3d 1097, 1099 (9th Cir. 2008). However, in that example during the questioning, "unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Berkemer v. McCarty*, 468 U.S. 420, 439-440 (1984).

Reasonable suspicion must be based upon "a *particularized* and *objective* basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418 (1981) (emphasis added). An officer's hunch that criminal activity is afoot fails to establish reasonable suspicion. *United States v. Thomas*, 211 F.3d 1186, 1191 (9th Cir. 2000). Also, "innocuous conduct does *not* justify an investigatory stop unless there is other information or surrounding circumstances of which the police are aware, which, when considered along with the otherwise innocuous conduct, tend to indicate criminal activity has occurred or is

about to take place." *United States v. Montero-Camargo*, 208 F.3d 1122, 1130 (9th Cir. 2000) (emphasis in original); *see also United States v. Torres-Urena*, 513 F.2d 540, 542 (9th Cir. 1975).

Reasonable suspicion may not be based on "prefabricated or recycled profile[s] of suspicious behavior very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on hunch." *United States v. Rodriguez*, 976 F.2d 592, 595-96 (9th Cir. 1992). The Ninth Circuit in *Rodriguez* held that the factors relied on by border patrol agents to justify the stop of the defendant's vehicle "describe too many individuals to create a reasonable suspicion that this particular defendant was engaged in criminal activity." *Rodriguez*, 976 F.2d at 596.

So it is with the facts in this case. The observations made by Fetterhoff describe "the innocent motoring public" and are based upon "prefabricated or recycled profiles."  The Court should suppress the evidence seized from Imhoff's rental vehicle because Fetterhoff lacked reasonable suspicion to investigate Imhoff for drug trafficking and unreasonably prolonged the traffic stop beyond Fourth Amendment limitations. *See Rodriguez v. U.S.*, 135 S.Ct. 1609 (2015).

### A. Trooper Fetterhoff's roadside questioning and observations did not create reasonable suspicion to extend a run-of-the-mill speeding violation traffic stop into a drug trafficking investigation.

Fetterhoff's suspicion that Imhoff was transporting illegal drugs was based on nothing more than a hunch at best. Fetterhoff pulled Imhoff over for speeding and

had essentially ended the routine traffic stop with a written warning. The trooper then turned the traffic stop into an investigatory stop for drug trafficking even though he lacked a "particularized and objective" basis for suspecting that Imhoff was involved any additional criminal activity. *See Cortez*, 449 U.S. at 417-418. Instead, Fetterhoff attempted to justify his actions based on Imhoff's innocuous conduct and the trooper's own vague observations and beliefs which amounted to nothing more than "prefabricated or recycled profiles of suspicious behavior very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on hunch." *See Montero-Camargo*, 208 F.3d at 1130; *Rodriguez*, 976 F.2d at 595-96.

Fetterhoff relies on the following to support his belief that Imhoff was running drugs:

1. The fact that Imhoff was driving a rental vehicle (USAO – 004);

2. Fetterhoff's beliefs about work schedules in North Dakota oilfield, and that "a five-day rental is not consistent with normal shift operation in the oilfield" *Id.*;

3. Fetterhoff's description of the contents of the minivan  (USAO – 004-005); and

4. Imhoff was driving from Las Vegas to North Dakota. *Id.*

The conduct that Fetterhoff claimed led him to believe that Imhoff was running drugs can easily be defined as "innocuous conduct" which, in the absence

of any other information or surrounding circumstances that would tend to indicate criminal activity, cannot justify an investigatory stop. *Montero-Camargo*, 208 F.3d at 1130. It is important to note that this is not a typical "wall stop" where drug agents are aware of someone driving with narcotics in the vehicle and use local law enforcement to create a traffic stop to disguise the on-going drug investigation, which serves for the real basis for the stop. There is no information provided in the discovery or the surrounding circumstances which existed prior to the traffic stop to suggest there was anything illegal going on with Imhoff's travel.

Investigatory stops, as distinguished from traffic stops, must be based on reasonable suspicion "based upon articulable facts that criminal activity is afoot." *United States v. Summers*, 268 F.3d 683, 686 (9th Cir. 2001). The scope of an investigative stop "must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

This case can be analyzed in a similar fashion as this Court analyzed the facts in *United States v. Garcia*, 2019 WL 6465203, *8-9 (CR 19-20-BU-DLC) (D. Mont. 2019) *appeal filed by United States v. Garcia*, 9th Cir. December 3, 2019. In *Garcia*, the trooper detained the two defendants who rode in the bed of a pickup truck after he issued a warning to the driver and determined that neither man was subject to a warrant. *Id.*, *8. This Court noted that the "universe of information" available to the officer in that case included: 1) the defendants' presence in the bed of a pickup truck;

13

2) their criminal histories; 3) one man's status as a "known criminal gang member;" 4) the men's use of cigarettes; 5) the trooper's belief that the men told conflicting histories about how they got to Montana; 6) the driver's report that the men had spent the night at the Town Pump; 7) the existence of the backpacks; and 8) the fact that the men were traveling without a vehicle. *Id.* This Court determined that "Taken together, these bits of information cannot authorize the continued detention of [the defendants] and the dog sniff performed on the backpacks." *Id.* The Court granted the defendants' motion to suppress.

Here, the "universe of information" available to Fetterhoff before he directed Imhoff to join him in his patrol car included: 1) Imhoff was driving a rental vehicle, 2) the Trooper's own beliefs about "normal" work schedules in another state's oilfield, 3) the contents of the vehicle, and 4) the fact that Imhoff was traveling from Las Vegas to North Dakota. Fetterhoff assessed this information in only a one-minute-and-twelve-second encounter with Imhoff, which he stated caused him to believe that Imhoff was involved in drug trafficking. This comes nowhere near the information that the trooper in *Garcia* had—including information about the men's criminal history and one man's gang status—which this Court determined was insufficient to justify the defendants' continued detention and a dog sniff of their backpacks. *Garcia*, *8.  In fact, Imhoff's lack of **any** criminal or traffic record, or involvement in gang or drug activity flies in the face of any perceived particularized

14

suspicion to support the trooper's extension of the traffic stop beyond the speeding violation.

The information Trooper Fetterhoff relied on reflects innocuous conduct and "prefabricated or recycled profile[s] of suspicious behavior very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on hunch." *See Montero-Camargo*, 208 F.3d at 1130; *Rodriguez*, 976 F.2d at 595-96; *Garcia*, *8-9. Accordingly, Fetterhoff extended the traffic stop "past the point of a brief investigation into the possibility of criminal wrongdoing" as in *Garcia. Id.*, *9. Likewise, here as in *Garcia*, Fetterhoff had insufficient justification for Imhoff's continued detention pending the dog sniff. *Id.* Accordingly, the physical evidence found in Imhoff's vehicle, after Fetterhoff's K9 gave the positive alert, is fruit of the poisonous tree and must be excluded. *Id.*, *9 (*citing Wong Sun v. United States*, 371 U.S. 471, 484-87 (1963).

**B. Fetterhoff unreasonably and unconstitutionally extended both the duration and scope of the initial traffic stop when he directed Imhoff to join him in his patrol car where he began inquiring specifically into information related to the Trooper's hunch about drug trafficking.**

When Fetterhoff told Imhoff to join him in his patrol car, he unconstitutionally extended the traffic stop. As discussed above, no reasonable suspicion existed to justify extension of the traffic stop.

A seizure pursuant to an actual traffic violation justifies a police investigation of that particular violation. The tolerable duration of police inquiries in the traffic

stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop. *Rodriguez*, 135 S.Ct. at 1614. Such a stop may last no longer than necessary to effectuate that purpose. *Id.* Such tasks include checking the driver's license, determining whether outstanding warrants exist, and inspecting the vehicle's registration and proof of insurance. *See United States v. Evans*, 786 F.3d at 786 (citing *Rodriguez*, 135 S.Ct. at 1615) (quotation omitted). The inquiries are designed to ensure "vehicles on the road are operated safely and responsibly." *Id.* Authority for the traffic stop, however, ends "when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Rodriguez*, 135 S.Ct. at 1614 (a dog sniff of a vehicle was held unrelated to the traffic stop mission where it added time to the stop and was not otherwise supported by independent reasonable suspicion of wrongdoing).

"The vast majority of roadside detentions last only a few minutes." *Berkemer*, 468 U.S. at 437. Presumptively, therefore, the detention of a person stopped for a traffic violation is temporary and brief. *Id.*; *Prouse*, 440 U.S. at 653 (traffic stop "is quite brief"). "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop." *Id.* An initially legal traffic stop may become illegal if inquiries into matters unrelated to the justification for the stop unreasonably prolong the stop. *United States v. Turvin*, 517 F.3d 1097, 1103-04 (9th. Cir. 2008).

Tasks that are not related to the traffic stop mission, such as dog sniffs, are unlawful if they add time to the stop and are not otherwise supported by independent reasonable suspicion of wrongdoing. *United States v. Evans*, 786 F.3d 779, 785 (9th Cir. 2015). In *Prouse*, the Court determined that prolonging the stop for seven minutes beyond the time required to address the traffic violation for the purpose of performing a drug dog sniff violated the Fourth Amendment's shield against unreasonable seizures when the officers lacked reasonable suspicion or consent to prolong the seizure. *Prouse*, 440 U.S. at 653. Additionally, a law enforcement officer expands the scope of a traffic stop when he compels a person to exit their vehicle for investigative purposes unrelated to the mission of a lawful traffic stop. See *United States v. Wrobel*, 295 F.Supp.3d 1127 (D. Idaho 2018).

Fetterhoff illegally extended the duration and scope of the stop by directing Imhoff to sit with him in his patrol car so he could further interrogate Imhoff related to his hunch that Imhoff was trafficking drugs. This illegal extension occurred after the traffic stop had ended with a written warning. Instead, Fetterhoff stated that after his one-minute-and-twelve-second questioning of Imhoff: "All things seen thus far in the traffic stop were indicators to me, based on my training and experience, of possible drug trafficking." (USAO – 005.) "I believed Imhoff to be transporting drugs within his rental vehicle." *Id.*

The Trooper had already inspected Imhoff's driver's license and rental contract and had ended his interaction with Imhoff with a written warning for speeding. Inside the patrol car, Fetterhoff called in a request to dispatch to run Imhoff's criminal history, specifically related to drug offenses. He continued questions unrelated to the traffic stop relating to Imhoff's travel, work, and housing arrangements. What should have been an encounter that took a few minutes was extended into more than 20 minutes due to the Trooper's delay in resolving the traffic matter expeditiously and interrogation on matters unrelated to the stop.

As in *Wrobel*, Fetterhoff ordered Imhoff out of the vehicle so he could facilitate an unrelated criminal investigation. *See Wrobel*, at 1134 (*citing Rodriguez* at 1615-16). The trooper ordered Imhoff to exit the vehicle after he had ended the reason for the traffic stop. This directive was unrelated to the traffic stop and therefore unconstitutionally expanded the scope of the seizure.

The Ninth Circuit has also held that completing a background check unrelated to the traffic stop unconstitutionally prolongs a stop. In *Evans*, the officer performed a vehicle records and warrants check. Then, the officer requested an ex-felon registration check to inquire about Mr. Evans' criminal history and to confirm whether he was registered at the address Evans had provided. The ex-felon registration check revealed that Evans had been twice convicted for drug-related

18

crimes and that he was properly registered at the address he provided. *Evans*, 786 F.3d at 786.

The Ninth Circuit held that the ex-felon registration check was "wholly unrelated" to the officer's traffic stop mission of ensuring vehicles on the road are operated safely and responsibly. *Id.* Consequently, Evans' Fourth Amendment rights to be free from unreasonable seizures were violated when the traffic stop was prolonged eight minutes to conduct the ex-felon registration task. *Id.* at 787. The officer testified that when he decided to run the ex-felon registration check, he believed Evans had "something more than a simple traffic violation." Running that check, therefore, was a "measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* at 786 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 38 (2000)).

Here, Fetterhoff similarly called in to dispatch to request Imhoff's criminal background, specifically asking for any drug offenses based on his hunch that Imhoff was transporting drugs. As in *Evans*, this inquiry was "wholly unrelated" to Fetterhoff's traffic stop mission of ensuring vehicles on the road are operated safely and responsibly. *Evans*, 786 F.3d at 786. Of note, Imhoff had no drug convictions when the trooper inquired.

Likewise, the information Fetterhoff gathered in his discussion with Imhoff in the patrol car was not relevant or necessary for completing the traffic warning. The trooper listed the address from Imhoff's Florida driver's license in his report, so

he had no need to ask about Imhoff's temporary work residence in North Dakota. (USAO – 003.)

Fetterhoff's questioning relating to Imhoff's travel, work plans, and residential arrangements were designed to build a basis to search the vehicle and were wholly unrelated to the speeding warning. These inquiries improperly extended the stop. Fetterhoff's continual questioning of Imhoff went well beyond that which was necessary for him to issue a speeding ticket or warning.

Furthermore, at the end of Fetterhoff's interrogation of Imhoff, when the trooper decided to perform a dog sniff, although he told Imhoff he was free to leave, there was nowhere for Imhoff to go as he was approximately eight miles from Columbus.  Imhoff sat with Metcalfe in his vehicle while Fetterhoff conducted his K9 sweep of the exterior of the vehicle. Only after the dog sniff was complete did Metcalfe drive Imhoff to Columbus. This represents an additional improper extension of the stop.

**C. Even if the Court determines that Fetterhoff was still performing traffic related tasks while he and Imhoff sat in the patrol car, the Court must also acknowledge that the Trooper's unrelated questions unlawfully extended the stop and the information that Fetterhoff describes to support his hunch still does not rise to the level of creating reasonable suspicion that Imhoff was involved with drug trafficking.**

Even if the Court believes that Fetterhoff was completing the necessary work to wrap up the speeding warning while sitting with Imhoff in his patrol car, it should

be very clear that the trooper was simultaneously attempting to prod Imhoff for more information that could create reasonable suspicion for drug trafficking.

These circumstances are strikingly similar to a recent case in the District of Montana, *United States v. Rea*, 393 F.Supp.3d 1025 (D. Mont. 2019). In *Rea*, Judge Watters determined that a highway patrolman improperly extended the duration of a traffic stop for a broken headlight.

As is the case here, the driver of the vehicle in *Rea* did not have perfect responses to a litany of questions related to travel and employment. Like here, the trooper in Rea continued to ask a variety of questions unrelated to the basis for the traffic stop. Like here, the trooper indicated that the traffic stop was over before continuing to engage in a detention and investigation on a matter unrelated to the purpose of the stop. Like here, the officers used a drug dog to sniff the vehicle. Fetterhoff, whether intentionally or not, did not allow Imhoff to complete his answers. Fetterhoff also asked very vague questions and did not ask obvious follow up questions which could have elicited appropriate, full responses.

Judge Watters granted the Rea's motion to suppress evidence seized from his vehicle after determining that whether "due to cunning, training, coincidence, or some other reason, the video establishes a clear pattern: [the trooper] performs one or two traffic related tasks, pivots to unrelated questions, and when the questions

21

don't produce anything obviously nefarious, he pivots back to traffic related tasks." *Rea*, 393 F.Supp.3d at 1032.

Judge Watters rejected the government's argument that the officer "was free to ask questions so long as he diligently performed traffic related tasks." *Id.* Under *Rodriguez* (135 S.Ct. at 1616), Judge Watters held that "the crucial question is whether performing the unrelated tasks added time to the stop." In *Rea*, Judge Watters held that "Several times, in clear violation of *Rodriguez*, [the officer] performed no traffic related tasks while asking unrelated questions. At other times [the officer] attempted to multi-task by performing background checks while asking unrelated questions." *Id.*

Even if the Court believes that Fetterhoff's questioning was dissimilar to the "multi-tasking" approach of the officer in *Rea*, the information he gleaned still did not rise to the level for reasonable suspicion to extend the stop.

Again, to support his claim for reasonable suspicion, Fetterhoff describes the following from his interaction with Imhoff in the patrol vehicle:

1. The Trooper's perception that Imhoff was shaking and nervous which the Trooper believed was inconsistent "with the innocent motoring public" (USAO – 005);

2. Again, Fetterhoff's beliefs about "common work schedules in North Dakota" *Id.*;

3. Imhoff's explanation that he rented a room from a friend in North Dakota which Fetterhoff believed constituted a change in Imhoff's previous story about "having a house" *Id.*; and

4. Imhoff's inability to provide the address or the zip code for the house. *Id.*

Fetterhoff described in his report that this conduct led him to believe that Imhoff was engaged in *major* criminal drug activity." (USAO – 005, emphasis added.) This is clearly an extreme exaggeration on the Trooper's part intended to overcompensate for his lack of reasonable suspicion. Fetterhoff's calculations conveniently disregarded the fact that dispatch reported back that Imhoff had no criminal history whatsoever.

Yet again, the conduct described by Fetterhoff is more akin to "innocuous conduct" than to "major criminal drug activity." *See Montero-Camargo*, 208 F.3d at 1130. In the absence of any other information or surrounding circumstances that would tend to indicate criminal activity, this conduct cannot justify an investigatory stop. *Id.*

i.    **Imhoff's allegedly extreme nervousness while sitting in Fetterhoff's patrol car cannot create reasonable suspicion for extending the stop.**

The brief video footage from Fetterhoff's camera where Imhoff can actually be seen or heard do not support Fetterhoff's allegation of nervousness. Furthermore, Metcalfe's video focused on Imhoff's appearance exclusively and it is in direct contrast to what is described by Fetterhoff.

Even *assuming arguendo* that Fetterhoff's description of Imhoff's nervousness was accurate, that observation alone does not rise to the level of reasonable suspicion.  Fetterhoff's alleged that while sitting in the patrol car, Imhoff displayed a high level of nervousness which caused the trooper further suspicion that he was running drugs. First, Fetterhoff claimed that "Imhoff's level of over nervousness was not consistent with the innocent motoring public." (USAO – 005). Second, Fetterhoff stated that Imhoff's level of nervousness "never subsided, only grew to the point where I could see his heart and stomach pulsating through his shirt, which is not consistent with the innocent motoring public." *Id.*

While the poor audio quality of the dash cam obscures an ability to hear well, what actually can be heard does not suggest nervousness. In light of what can be heard on the audio and later supported by Imhoff's appearance in Metcalfe's vehicle, it appears at least questionable whether the trooper could actually see pulsations through Imhoff's shirt. Imhoff was wearing a loose-fitting camouflage shirt, as seen at timestamp 7:17 in dash cam video from Fetterhoff's vehicle and prominently displayed throughout Imhoff's stay in with Metcalfe in Metcalfe's patrol car.  Imhoff did not appear the least bit nervous, let alone nervousness that showed his "heart and stomach pulsating through his shirt."

Regardless, in the District of Montana, "'nervousness during a traffic stop ... in the absence of other particularized, objective factors, does not support a

reasonable suspicion of criminal activity, and does not justify an officer's continued detention of a suspect after he has satisfied the purpose of the stop.'" *United States v. Trinidad*, 2006 WL 3462970, *5 (D. Mont. 2006) (*quoting United States v. Chavez-Valenzuela*, 268 F. 3d 719, 726 (9th Cir. 2001)).

No other particularized objective factors existed beyond Imhoff's alleged nervousness to support Fetterhoff's suspicion of criminal activity to continue to detain Imhoff and expand the scope of questioning beyond that necessary for the traffic stop.

> **ii.   The additional conversation between Fetterhoff and Imhoff in the patrol car about his travel and work did not create reasonable suspicion for extending the stop.**

Fetterhoff claims that Imhoff contradicted himself about his house in North Dakota and could not give an address or zip code for the residence, which he used as an additional basis for believing that Imhoff was involved in trafficking drugs. Fetterhoff claimed that during this conversation in which Imhoff was demonstrating extreme nervousness, it was suspicious that he could not answer questions regarding the address or zip code of his house in North Dakota or recite the zip code.  Fetterhoff believed he changed his story from "I have a house" to "I rent a room from a friend." The fact is, Fetterhoff kept cutting off Imhoff's responses and did not ask follow-up questions to truly understand. He simply "created" confusion for the purpose of continuing his unlawful interrogation.

Even if the Court determines that Imhoff's responses to Fetterhoff's unlawful interrogation did not add up perfectly, "fairly minor evasions and inconsistencies" normally do not constitute reasonable suspicion. *United States v. Evans*, 122 F.Supp.3d 1027, 1036 (D. Nev. 2015) (citing *United States. v. Simpson*, 609 F.3d 1140, 1150 (10th Cir. 2010)). Mere uneasy feelings and inconsistent stories do not constitute articulable facts that support a reasonable suspicion of drug trafficking. *Id*., *citing United States v. Estrada*, 459 627, 631 (5th Cir. 2006). The Trooper's actions prolonged the stop unnecessarily and unreasonably despite his view that what he was being told was inconsistent.

Even if the Court considers the information Fetterhoff obtained during his patrol car discussion with Imhoff—that Imhoff appeared nervous, a repeat of the Trooper's beliefs about "common work schedules in North Dakota, Imhoff's explanation that he rented a room from a friend, and Imhoff's inability to provide the address or zip code for the house"—the "universe of information" available to Fetterhoff still falls well short of the information available to the trooper in *Garcia* which this Court determined was insufficient to raise reasonable suspicion. *Garcia*, \*8. Additionally, when viewing the totality of the circumstances, the fact that MHP dispatch reported back to Fetterhoff that Imhoff had no criminal history weighs heavily against reasonable suspicion here. *See Robinette*, 519 U.S. at 39.

Nothing in the record supports reasonable suspicion by Fetterhoff that Imhoff was involved in criminal activity. This was a hunch at best that admittedly turned out to be correct. However, the Trooper had no *particularized* and *objective* basis for suspecting Imhoff to be involved in criminal activity, never mind "major" criminal activity as he states in his report. *Cortez*, 449 U.S. 417-418; *Thomas*, 211 F.3d at 1191; (USAO – 005). The ends do not justify the means. The evidence seized from the vehicle was the result of a constitutional violation and should be suppressed.

## IV.   CONCLUSION

In reviewing "the totality of the circumstances," the information Fetterhoff used to support his hunch relied on "prefabricated or recycled profile[s] of suspicious behavior very likely to sweep many ordinary citizens into a generality of suspicious appearance" to convert otherwise "innocuous conduct" into reason to suspect criminal activity. *Robinette*, 519 U.S. at 39; *Rodriguez*, 976 F.2d at 595-96; *Montero-Camargo*, 208 F.3d at 1130. The Court must suppress the evidence located in Imhoff's vehicle as the fruit of an unlawful search and seizure. *Wong Sun*, 371 U.S. at 484.  The fact that Fetterhoff's hunch was correct and ultimately resulted in a large seizure of narcotics, does not justify or "cure" the improper search and seizure. Law enforcement achieved the goal removing the drugs from the streets.

However, they should not be further rewarded for violating constitutional rights in the process.

Respectfully submitted this 26th day of April 2020.

/s/ Lance Lundvall
Lance Lundvall
Attorney for Defendant

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief complies with Local Rule 7.1(d)(2) (as amended). The Brief's line spacing is double spaced, and is proportionately spaced, with a 14-point font size, and contains less than 6,500 words. (Total number of words: 6,385, excluding tables and certificates).

DATED this 26th day of April, 2020.

/s/ Lance Lundvall
Lance Lundvall
Attorney for Defendant

# CERTIFICATE OF SERVICE

I hereby certify that on April __, 2020, a copy of the foregoing document

was served on the following person by the following means:

___   CM-ECF
___   Hand Delivery
___   Fax
___   Mail
___   Email

1.   CLERK, U.S. DISTRICT COURT

2.   JULIE R. PATTEN
     Assistant United States Attorney
     James F. Battin U.S. Courthouse
     2601 2nd Avenue North, Ste. 3200
     Billings, MT 59101

          Counsel for the United States

3.   NICHOLAS JAMES IMHOFF,

          Defendant

                                        /s/ Lance Lundvall_____
                                        Lance Lundvall
                                        Attorney for Defendant